IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

---

**Donna McKay,**

                    Plaintiff

          *vs.*

**State of New York**,

                    Defendant

---

**MEMORANDUM OF LAW
OF THE PLAINTIFF**

Civil No.:  6:16-cv-06834

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES............................................................................................ i

I. CROSS-MOTION FOR SUMMARY JUDGMENT................................................................. 1

    I.A.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE
           PLAINTIFF'S CLAIM UNDER 18 U.S.C. §925A ................................................. 1

           I.A.(1.)   THERE IS NO QUESTION OF FACT CONCERNING THE
                      PLAINTIFF'S CLAIM UNDER 18 U.S.C. §925A............1

           I.A.(2.)   THE FUNDAMENTAL CIVIL RIGHTS OF THE PLAINTIFF ARE
                      BEING INFRINGED WITHOUT A BASIS IN FACT............3

           I.A.(3.)   THE DEFENDANT IS NOT FULFILLING ITS OBLIGATION FOR
                      TIMELY AND ACCURATE REPORTING TO NICS............6

    I.B.   THE COURT SHOULD DECLARE A RIGHT TO COUNSEL AT LICENSE
           HEARINGS INVOLVING MENTAL HEALTH ALLEGATIONS TO PROTECT
           VALUABLE CIVIL RIGHTS ............................................................................... 8

           I.B.(1.)   THE RIGHT TO COUNSEL EXTENDS INTO CERTAIN CIVIL
                      AND QUASI-CRIMINAL PROCEEDINGS......................8

           I.B.(2.)   NEW YORK IS A NATIONAL LEADER IN PROVIDING
                      COUNSEL TO THE INDIGENT AND TO MENTAL HEALTH
                      PATIENTS. THE RELIEF REQUESTED IS AN ORGANIC
                      EVOLUTION OF SUCH DUE PROCESS GUARANTEES.......12

    I.C.   THE COURT SHOULD DEFINE NOTIFICATION REQUIREMENTS THAT
           SATISFY THE RIGORS OF DUE PROCESS INTERSECTED WITH A
           FUNDAMENTAL CIVIL RIGHT ......................................................................... 14

           I.C.(1.)   SIMPLE, EARLY NOTIFICATION OF INDIVIDUALS COULD
                      SATISFY MINIMUM DUE PROCESS REQUIREMENTS UNDER
                      *MATHEWS V. ELDRIDGE* WHEN ONE OR MORE FUNDAMENTAL
                      RIGHTS ARE IMPLICATED................................14

I.C.(2.)   PARTICULARLY IF NOTICE IS BEING GIVEN POST-
DEPRAVATION, THE EARLIER THE BETTER FROM A DUE
PROCESS STANDARD.....................................16

II.   OPPOSITION TO THE MOTION TO DISMISS .........................................   17

II.A.   THE COMPLAINT MEETS THE "PLAUSIBILITY ON ITS FACE"
STANDARD ..............................................................................   18

II.B.   THE COMPLAINT PLEADS A *PRIMA FACIE* CLAIM FOR THE RIGHT TO
COUNSEL AS PART OF THE RIGHT OF DUE PROCESS UNDER THE
FIFTH, SIXTH AND FOURTEENTH AMENDMENTS ...........................   20

II.C.   THE COMPLAINT PLEADS A *PRIMA FACIE* CLAIM FOR NOTIFICATION
AS PART OF THE RIGHT OF DUE PROCESS UNDER THE FIFTH AND
FOURTEENTH AMENDMENTS .....................................................   23

III.   THE PLAINTIFF'S CASE IS NOT BARRED BY THE ELEVENTH
AMENDMENT TO THE U.S. CONSTITUTION ......................................   24

# TABLE OF AUTHORITIES

**CONSTITUTIONAL AND STATUTORY PROVISIONS**                     **PAGE**

U.S. Const. amend. II ......................................................................... 3, *passim*

U.S. Const. amend. V ..................................................  .........  ......... 14

U.S. Const. amend. VI ...................................................................  ......... 8, 9

U.S. Const. amend. XIV.................................................................. 4, 9

The Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993)............ 5

The Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-618, 82
    Stat. 1213-2 (1968)........................................................................ 4

18 U.S.C. §922(g) ............................................................................ 3, 4

18 U.S.C. §922(g)(1) ....................................................................... 5

18 U.S.C. §922(g)(4)....................................................................... 1, *passim*

18 U.S.C. §924(a)(2) ....................................................................... 3

18 U.S.C. §925A ............................................................................. 1, 7

18 U.S.C. §926 ............................................................................... 5

28 U.S.C. §1738 ............................................................................. 22

42 U.S.C. §3732(c)......................................................................... 6

28 U.S.C.S. §1915(e) ...................................................................... 21


**REGULATIONS – FEDERAL**                                      **PAGE**

27 CFR §478.11 .............................................................................. 1, 4

28 CFR §25.4 ................................................................................. 5

28 CFR §25.6(a)............................................................................. 5

28 CFR §25.6(j) ............................................................................. 5

28 CFR §25.11 ............................................................................... 5

**STATUTORY MATERIALS – STATE AND LOCAL**                  PAGE

County Law Art. 18-B ........................................................................ 12

NY Civil Practice Law and Rules §1102 ................................... 22

NY Family Court Act §262 ............................................................ 12

NY Mental Hygiene Law §29.09 ................................................. 11

NY Mental Hygiene Law §47.01 ................................................. 11

NY Mental Hygiene Law Art. 81 ................................................ 11

NY Penal Law §400.00 .................................................................. 9


**REGULATORY MATERIALS – STATE**                            PAGE

22 N.Y.C.R.R. Part 622 .................................................................. 11

22 N.Y.C.R.R. Part 694 .................................................................. 11

22 N.Y.C.R.R. Part 823 .................................................................. 11

22 N.Y.C.R.R. Part 1023 ............................................................... 11


**CASES**                                                    PAGE

*Addington v. Texas,* 441 U.S. 418 (1979) ................................. 5, 13

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ..................................... 17, 19

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ........... 18, 19

*Boddie v. CT,* 401 U.S. 371 (1971) ............................................. 10

*Conley v. Gibson,* 355 U.S. 41 (1957) ....................................... 18

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ............... 3, 14

*Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005) ................... 22

*Fann v. Arnold,* 2016 U.S. Dist. LEXIS 64039 (W.D.N.Y., May 16, 2016) ............ 21

*Fhagen v. Miller,* 29 N.Y.2d 348 (1972) ................................... 11

*Frank v. Mangum,* 237 U.S. 309 (1915) ................................... 22

*Gideon v. Wainwright,* 372 U.S. 335 (1963)................................................ 8, 21

*In re McKay,* 52 Misc.3d 936 (2016) ......................................................... 1

*In re. Martin-Trigona,* 737 F.2d 1254 (2nd Cir. 1984) ............................... 20

*Joseph S. v. Hogan,* 561 F.Supp. 280 (E.D.N.Y. 2008)............................... 17

*Kachalsky v. Co. of Westchester,* 701 F.3d 81 (2012) ............................... 9

*Lassiter v. Dep't. of Soc. Svcs.,* 452 U.S. 18 (1981) .................................. 8

*M.L.B. v. S.L.J.,* 519 U.S. 102 (1996) ...................................................... 8, 9

*Mapp v. Ohio,* 367 U.S. 643 (1961).......................................................... 1

*Mathews v. Eldridge,* 424 U.S. 319 (1976)........................................ 8, *passim*

*Maness v. Meyers,* 419 U.S. 449 (1975) ................................................... 10

*Matter of Buttonow,* 23 N.Y.2d 385 (1968) .............................................. 11

*Matter of Kesselbrenner v. Anonymous,* 33 N.Y.2d 161 (1973) ................ 11

*McDonald v. City of Chicago,* 561 U.S. 742 (2010)................................... 3, 14

*Meyer v. Neb.,* 262 U.S. 390 (1923)......................................................... 8

*O'Connor v. Scarpino,* 83 N.Y.2d 919 (1994)........................................... 9

*Ohio Valley Envt'l. Coalition, Inc. v. Fola Coal Co., LLC,* 2013 U.S. Dist.
    LEXIS 154195 (W.Va.S.D., 2013) ...................................................... 18

*Olmstead v. U.S.,* 277 U.S. 438 (1928) ..................................................... 1

*Papasan v. Allain,* 478 U.S. 265 (1986) ................................................... 17

*Powell v. Alabama,* 287 U.S. 45 (1932)..................................................... 21

*U.S. v. Martin Trigona,* 756 F.2d 260 (1985) ............................................ 20

## FEDERAL RULES OF CIVIL PROCEDURE                                  PAGE

Fed.R.Civ.P. 8(a).................................................................................... 18

Fed.R.Civ.P. 8(a)(2)................................................................................ 18

Fed.R.Civ.P. 8(d)(1)................................................................................ 18

Fed.R.Civ.P. 8(e)...................................................................... 19

Fed.R.Civ.P. 12(b)(6) ........................................................... 1, *passim*

Fed.R.Civ.P. 12(h).................................................................. 22

Fed.R.Civ.P. 15(a)(2) ............................................................. 23

Fed.R.Civ.P. 15(d)................................................................. 23

Fed. R. Civ. P. 56 .................................................................. 1

## OTHER MATERIALS                                              PAGE

Bureau of Alcohol, Tobacco, Firearms and Explosives, "Active Records in
    the NICS Index as of December 31, 2016"................................. 6

Bureau of Justice Statistics, "NICS Act Record Improvement Program
    (NARIP) Awards FY 2009-2016" .................................... 6

Federal Bureau of Investigation, "NICS Index Brochure" ......................... 6

Federal Bureau of Investigation "National instant Criminal Background
    Check System (NICS) Operations," 2015....................... 6

New York Courts, "History of the Mental Hygiene Legal Service" ................ 11

New York Courts, "State of the Judiciary – 2012"................................. 12, 13

MEMORANDUM OF LAW
IN SUPPORT OF THE PLAINTIFF

## I.      CROSS-MOTION FOR SUMMARY JUDGMENT

Far from this case being dismissed under Fed.R.Civ.P. 12(b)(6), the Plaintiff should be granted her request for Summary Judgment pursuant to Fed.R.Civ.P. 56. The essential element of the first claim was admitted by the Defendant. There can be no dispute as to the facts set forth as the prongs underlying the second and third claims. Fed.R.Civ.P. 56(c)(1). Judgment with ancillary relief should enter in favor of the Plaintiff. "[F]urther delay in reaching the present result could have no effect other than to compound the difficulties." *Mapp v. Ohio,* 367 U.S. 643, 659, ftnt. 9 (1961).

### I.A.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE PLAINTIFF'S CLAIM UNDER 18 U.S.C. §925A.

#### I.A.(1.)    THERE IS NO QUESTION OF FACT CONCERNING THE PLAINTIFF'S CLAIM UNDER 18 U.S.C. §925A.

There is no question that the Plaintiff was erroneously reported by the Defendant to the FBI/ATF as having been "involuntarily committed." (Complaint, ¶13.) There is also no question that the County Court ruled in favor of the Plaintiff at the license hearing, finding no evidence to support the Defendant's claim that she had been "involuntarily committed." (Complaint, ¶76; *In re McKay,* 52 Misc.3d 936 (2016).) The Plaintiff is not a disqualified person under 18 U.S.C. §922(g)(4); 27 CFR §478.11. The Defendant erred in its reporting and did not correct the erroneous report. (Levin, ¶7; Def. Memo., p. 4.) All negative records concerning the Plaintiff created by the Defendant must be corrected and in a permanent manner.

The first of the Plaintiff's claims has been admitted by the Counsel to the Defendant. (Levin, ¶7; Def. Memo., p. 4.)  The State did not correct the Plaintiff's records upon entry of the final decision in her license hearing.  The State failed to meet its responsibility to correct an erroneous record(s) it had reported to the FBI/ATF for inclusion in the NICS Index.  It took the filing of this federal lawsuit to cause the State to take action, although no documentation was submitted by Counsel to the Defendant or by the officers of the referenced state agencies in support of its allegations.

According to Counsel to the Defendants, in the absence of an order of this Court, they will potentially change the Plaintiff's records back to "involuntary commitment" status. (Levin, ¶¶8-9; Def. Memo., p. 5, ftnt. 1.)  Counsel for the Defense cannot be permitted to rifle through and change the Plaintiff's medical records and database records, while disrespecting the findings of a binding court order of competent jurisdiction.  Government is the omnipresent teacher.  "For good or for ill, [Government] teaches the whole people by its example.  Crime is contagious.  If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. U.S.,* 277 U.S. 438, 485 (1928).

The Plaintiff is entitled to a correction of the erroneous NICS record and to have confidence that the correction will be permanent.  18 U.S.C. §925A.  She is entitled to an award of attorney's fees and costs for being compelled to bring this federal lawsuit to correct the Defendant's erroneous record.  *Id.*  Details of the fees and costs in this matter, along with something of the credentials of the undersigned and the billing in this matter, quantify the request for attorney's fees and costs. (Capanna, ¶6.)

The Defendant tries to lay blame on the hospital. (Levine, ¶4.)  No doctor is as powerful as a judge.  In the absence of a court order of "involuntary commitment," it is improper for the Defendant to report an individual to the FBI as having been "involuntarily committed." (Complaint, ¶¶55-57.)  The record that would support the federal reporting requirement does not originate in a medical chart at a hospital; it originates in a court of law.  It is not the hospital's responsibility to know the law of federal firearms disqualification.  It is the Defendant's responsibility to know the law, to accurately report, and to promptly correct erroneous records.

### I.A.(2.) THE FUNDAMENTAL CIVIL RIGHTS OF THE PLAINTIFF ARE BEING INFRINGED WITHOUT A BASIS IN FACT.

What is at stake for the Plaintiff is no less than the restoration of her fundamental rights under the Second Amendment to the United States Constitution.  *McDonald v. City of Chicago,* 561 U.S. 742, 791 (2010); *District of Columbia v. Heller,* 554 U.S. 570 (2008).

> "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is the "central component" of the Second Amendment right.  Explaining that "the need for defense of self, family, and property is most acute" in the home, this right applies to handguns because they are "the most preferred firearm in the nation to keep and use for protection of one's home and family." ... Thus, we concluded, citizens must be permitted "to use handguns for the core lawful purpose of self-defense." *Heller* makes it clear that this right is "deeply rooted in the nation's history and tradition." (citations omitted, throughout)

*McDonald, supra,* at 767-768.  The Plaintiff was a law-abiding firearms owner and handgun licensee for years, in order to defend herself and her family, as well as to hunt for food and procure animal hides. (Complaint, ¶¶25-26.)  It is important to her that her rights be restored.

If an individual is disqualified pursuant to one of the factors found at 18 U.S.C. §922(g), the individual is permanently disqualified in all fifty states and in all U.S. territories from the ownership, use, or possession of firearms.  Further, if the disqualified person is subsequently

found to possess, own, or use a firearm, the person may be charged with and guilty of a federal felony, punishable by not more than ten years imprisonment, a fine, or both. 18 U.S.C. §924(a)(2). When the Defendant reports an individual to the FBI for inclusion in the NICS Index,[1] it does so with the intention to permanently strip that individual of his or her fundamental rights, to divest them of their firearms, and to create a basis for future law enforcement pursuits.

For nearly 200 years, the Second Amendment sat upon the Bill of Rights shelf and was left largely to itself. Fortunately, by 2010, the Second Amendment was recognized by the U.S. Supreme Court as a fundamental right, guaranteed to the individual, including against infringement by federal and state governments. *McDonald, id,* at 791. The Second Amendment became the modern civil rights movement.

Three decades prior to the appropriate U.S. Supreme Court recognition of the Second Amendment as a fundamental right, the Gun Control Act passed in 1968.[2] The GCA introduced the startling concept that an individual could be "permanently disqualified" from the exercise and enjoyment of their Second Amendment rights. 18 U.S.C. §922(g). The Second Amendment is the only civil right that can be stripped, permanently, from an American – a punishment unheard of for any other liberty enshrined in the Bill of Rights in 1791 or added through the Fourteenth Amendment in 1868. We are now in that stage of history that we must interpret and balance fundamental civil rights under the Second Amendment with a statute enacted prior to the decisions in *Heller* and *McDonald.*

---

[1] *N.B.:* the NICS Index is managed by the FBI. The ATF manages the NICS background check system as the interface for FFLs and customers.
[2] The Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-618, 82 Stat. 1213-2 (1968).

Fortunately, as originally drafted and as preserved in every amendment to the

disqualification factors since 1968, the disqualification factors carry a heavy threshhold for due

process.  Disqualification is largely determined by a court order, including that the disqualification

for "involuntary commitment" requires a court order. 27 CFR §478.11.  Such a court order can

only issue after certain guarantees are fulfilled, such as the right to a hearing, the right to present

testimony and evidence, the right to cross-examine witnesses and challenge documents, the right

to be represented by counsel, the right to a written decision, and the right to appeal that decision.

*Addington v. Texas,* 441 U.S. 418, 425 (1979).  The disqualification pursuant to 18 U.S.C.

§922(g)(4) is no less rigorous than a disqualification pursuant to 18 U.S.C. §922(g)(1) for a felony

conviction.

To implement the disqualification factors, Congress enacted the Brady Act in 1989,[3]

creating the National Instant Background Check System ("NICS").   NICS relies upon voluntary

federal and state submissions of records into the "NICS Index," which is the database against

which a background check is run when a customer attempts to purchase a firearm through a

Federal Firearms Licensee.  The participation of a state in the NICS system is voluntary. The

contribution of any records by any federal or state office or agency is also voluntary.

18 U.S.C. §926; 28 CFR §25.4.

An individual such as the Plaintiff cannot monitor the Defendant's correction of an

erroneous record by walking into an FFL for a background check.  The individual must be a

potential customer for the purchase of a firearm.  The NICS Background Check system is limited

by statute in its use and its users; it is not an all-purpose dataset for general background checks by

any requesting agency or office.  28 CFR §25.6(a) ("FFLs may initiate a NICS background check

---

[3] The Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

only in connection with a proposed firearm transfer as required by the Brady Act. FFLs are strictly prohibited from initiating a NICS background check for any other purpose.");
28 CFR §25.6(j) Access to NICS Index for purposes unrelated to NICS background checks are limited to specified agencies in connection with issuance of a firearm-related or explosives-related permit or license or in connection with ATF civil or criminal law enforcement activity relating to the GCA or NFA. Indeed, there are monetary and other civil penalties for state and local agencies, FFLs, and individuals who misuse or conduct unauthorized access to NICS. 28 CFR §25.11.

This creates a Catch-22 for individuals such as the Plaintiff. Even assuming one has the discretionary funds through which to casually purchase an additional firearm, such as an extra hunting rifle for even $300 - $400, how does one fill out ATF Form 4473? The first page of the form includes questions related to the disqualifying factors. (Ex. 8.) One of those questions, "11f," is whether the individual was ever "committed to a mental institution." The instructions explain the meaning of the question by quoting 27 CFR §478.11, as "a determination by a court, board, commission, or other lawful authority..." (Ex. 8, p. 4) To say "no" on "11f" is factually correct. But, if the NICS Index record hasn't been corrected, it will immediately trigger a conflict, and potentially subject the individual to the added charge of committing perjury. The ATF Form 4473 is signed by the customer on a representation of truthful responses, punishable as a federal felony. (Ex. 8, p. 2.) Without documentation that the Plaintiff's erroneous records have been corrected by the Defendant, she would be ill-advised to attempt to exercise her rights.

### I.A.(3.)    THE DEFENDANT IS NOT FULFILLING ITS OBLIGATION FOR TIMELY AND ACCURATE REPORTING TO NICS.

New York State did not start reporting individuals to the NICS Index until it started receiving federal funds as an incentive to do so. (Ex. 4, p. 4.) The Defendant has accepted more

than $16 million from the federal government to report people to the FBI Index in only two of the nine disqualifying categories, one of which is 18 U.S.C. §922(g)(4). "NICS Act Record Improvement Program (NARIP) Awards FY 2009-2016," see at https://www.bjs.gov/index.cfm?ty=tp&tid=491#Summary; 42 U.S.C. §3732(c).  The absurdity is that the Defendant doesn't report convicted felons, but it is reporting every patient receiving mental health treatment at a hospital, even if the patient voluntarily sought treatment.

FBI and ATF documents continually emphasize the critical importance that a contributing agency only report valid and accurate records to NICS in order to minimize erroneous denials. (See, e.g., "NICS Index Brochure" published by the FBI, see at https://www.fbi.gov/file-repository/nics-index-brochure.pdf/view.)  "The mission of the NICS Section is to enhance national security and public safety by providing the timely and accurate determination of a person's eligibility to possess firearms and/or explosives in accordance with federal law."  U.S. Dep't. of Justice, FBI, "National Instant Criminal Background Check System (NICS) Operations," 2015, p. ii; see at https://www.fbi.gov/file-repository/2015-nics-ops-report.pdf/view.  The NICS database depends upon the accuracy of the records submitted and the timeliness of corrections of erroneous records.  Polluted NICS data is the only result of reporting by the Defendant.

Optimum reporting in New York would be a DCJS review of court records before transmission to the FBI and the NSY Police of the individual report.  DCJS could then also notify the individual.  This would provide an appropriate emphasis to the individual that the database is law enforcement in nature (not civil) and is permanent in nature unless an error is established or relief is granted.  Such a notification should include concurrent notification to the individual of the reporting to the federal government.  Any notification should include a warning that the record

results in the permanent revocation of the individual's rights under the Second Amendment, unless corrected as an erroneous record or otherwise rescinded.

There is no question of fact that the Defendant did not correct the erroneous record concerning the Plaintiff in a timely manner after the County Court issued its decision and order. The Plaintiff should be granted summary judgment on her claim under 18 U.S.C. §925A, an order should enter directing the Defendant to correct the erroneous record, and an award of attorney's fees and costs should be made as requested.[4]

### I.B.   THE COURT SHOULD DECLARE A RIGHT TO COUNSEL AT LICENSE HEARINGS INVOLVING MENTAL HEALTH ALLEGATIONS TO PROTECT VALUABLE CIVIL RIGHTS.

The Complaint articulated the plea for counsel in a single, elegant sentence: "Effectively, the Second Amendment is being forfeited for less than $500." (Complaint, ¶100.) The Plaintiff laid out her saga, beginning with the surprise knock at the door by armed law enforcement officers who entered her home with a court order to confiscate her license and all of her firearms (Complaint, ¶17-22), continuing with her efforts to find a lawyer who would represent her either for free or for what she could raise through a garage sale (Complaint, ¶24, 30-31), how the lawyer she located had no experience in license hearings and knew a "little" about the "SAFE Act" (Complaint, ¶33), and how that hearing started with her and the attorney trying to "guess the basis, if any, for the government's claim, and to mount a defense to satisfy the rigors of federal law and the whims of state law" (Complaint, ¶34). These matters must be handled by specifically trained attorneys and certainly not by a litigant who is *pro se* due to indigence. (Capanna ¶¶12-16; Ex. 6.)

---

[4] The Plaintiff is not seeking compensation or other damages under this claim. *Robinson v. N.J. Mercer Co. Vicinage-Fam. Div.,* 514 Fed.Appx. 146, 149 (3rd Cir, 2013). The Plaintiff's 18 U.S.C. §1983 claims relate to her second and third claims for violations of her rights of counsel and due process, including notification.

### I.B.(1.)   THE RIGHT TO COUNSEL EXTENDS INTO CERTAIN CIVIL AND QUASI-CRIMINAL PROCEEDINGS.

The right to counsel for defendants in criminal cases is guaranteed by the Sixth Amendment. Yet it was not until 1963 that the U.S. Supreme Court passed *Gideon v. Wainwright,* 372 U.S. 335, which held that the fundamental right to counsel in criminal cases creates a corresponding state obligation to provide indigent defendants with representation.

> "From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him." *Id.,* at 344.

It is beyond the scope of this Memorandum to set out, but *Gideon,* of course, has been greatly expanded over the decades to applicability in more than felony level charges with potential sentencing of incarceration.

Moreover, the right to counsel as a matter of due process does not end at a bright line between those charged with a criminal act carrying the possibility of incarceration; it carries forward also into civil proceedings, one question at a time. "In that domain, to guard against undue official intrusion, the Court has examined closely and contextually the importance of the governmental interest advanced in defense of the intrusion." *M.L.B. v. S.L.J.,* 519 U.S. 102, 116 (1996). Time and again, the U.S. Supreme Court has analyzed a request for a right to appointed counsel under the Due Process Clause of the Fourteenth Amendment, using the capstone factors of *Mathews v. Eldridge,* 424 U.S. 319 (1976), where the government intrusion into the civil rights of the individual is "both total and irrevocable." *Lassiter v. Dep't. of Soc. Svcs.,* 452 U.S. 18, 39 (1981) (Blackmun, J., dissenting). It does so for rights that have been deemed "essential" (*Meyer*

*v. Neb.,* 262 U.S. 390, 399 (1923) (citations omitted), even though some such rights appear nowhere in the black letter of the Constitution or the Bill of Rights.

The right to counsel requested herein relates to fundamental civil rights under the Second Amendment in a civil hearing setting with collateral criminal implications. It is the perfect combination of the Second, Fifth, Sixth, and Fourteenth Amendments. It involves the potential permanent depravation of a fundamental civil right found under the Second Amendment. The civil hearing may result in a finding that will implicate the commission of a federal felony, including the potential for incarceration and monetary fine. The license hearing initiated through a mental health allegation, particularly of being a disqualified person, in such a secretive system of government operations puts the individual at high risk of erroneous depravation of fundamental rights and of incarceration. (Compl., ¶¶1-15; Ex. 1, 2, 3.) The troublesome circumstances presented by the instant case thus meet the classic *Mathews* criteria of a private interest affected by official action, risk of erroneous deprivation through the procedures used, and the benefits outweighing any fiscal and administrative burdens the additional requirement would entail. *Supra,* at 335. At the same time, the circumstances meet the *Gideon* preference towards the depravation of conviction. *Supra,* at 344-345.

The only path through which the individual can defend the handgun license is to participate in the government license hearing. (Ex. 2.) This State requires an individual obtain a handgun license in order to own, possess, or use a handgun. Penal Law §400.00. "Penal Law §400.00 is the exclusive statutory mechanism for the licensing of firearms in New York State." *Kachalsky v. Co. of Westchester,* 701 F.3d 81, 85 (2012), citing *O'Connor v. Scarpino,* 83 N.Y.2d 919, 920 (1994). The government then knocks on the door of the individual, using an *ex parte, sua sponte* Order to Show Cause, which, similarly to the NYS Police letter, accuses the individual

of the ongoing commission of a federal felony through the individual's continued possession of the handgun license and firearms. (Ex. 1.)  The Plaintiff was forced by state action to defend against the destruction of her fundamental rights under the Second Amendment, and to cast off the stigma associated with a finding of "involuntary commitment."  "Like a defendant resisting criminal conviction, she [sought] to be spared from the State's devastatingly adverse action." *M.L.R., supra,* 125.  Thus, the individual faces the potential loss of a fundamental right with judicial relief being the sole remedy. *Boddie v. CT,* 401 U.S. 371, 380-381 (1971).  "The requirement that these appellants resort to the judicial process is entirely a state-created matter." *Id.,* 383.

The individual also faces the potential that he or she unwittingly in the course of the license hearing makes statements that would otherwise be protected by the Fifth Amendment, an error that could be avoided through the appointment of counsel from the start.

> "This Court has always broadly construed its protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action.  The protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Maness v. Meyers,* 419 U.S. 449, 461 (1975).

Consider here that even as the officers entered the Plaintiff's home with only the civil Order to Show Cause, they did so on her unsuspecting consent, and in asking for the surrender of all firearms, they obtained the critical evidence that she was in possession of firearms after her discharge from the hospital. (Compl. ¶¶18-19, 20-21, 22; Ex. 2.)  And what of the current location of the Plaintiff's firearms after the County Court decision was handed down?  The Plaintiff, and every person similarly situated, and who has not been cleared from state and federal databases, lives on the edge that the next doorknock will be a law enforcement officer there to arrest them on

charges of committing a federal felony – even where a local court of competent jurisdiction has already declared that the individual is not a disqualified person.

### I.B.(2.)   NEW YORK IS A NATIONAL LEADER IN PROVIDING COUNSEL TO THE INDIGENT AND TO MENTAL HEALTH PATIENTS. THE RELIEF REQUESTED IS AN ORGANIC EVOLUTION OF SUCH DUE PROCESS GUARANTEES.

There is ample precedent for the assignment of counsel for persons facing mental health allegations. A court order of "involuntary commitment" carries as much due process requirement as does criminal incarceration, including that the patient is entitled to assigned counsel at no cost through Mental Hygiene Legal Services. MHL §29.09, §47.01; 22 N.Y.C.R.R. Parts 622, 694, 823, and 1023; MHL Art. 81. Created in 1964, the Mental Hygiene Legal Service "is the oldest legal advocacy program for the institutionalized mentally disabled in the United States." NY Courts website, "History of the Mental Hygiene Legal Service," at https://www.nycourts.gov/courts/ad2/pdf/mhlsart10/MHLS_history.pdf, p. 1. MHLS has been recognized as essential to the State's "protective shield of checks and balances" governing the admission, transfer, and retention of mental health patients. *Fhagen v. Miller,* 29 N.Y.2d 348, 355 (1972). The scope of patients served by MHLS includes even those involved in voluntary hospital proceedings. *Matter of Buttonow,* 23 N.Y.2d 385, 393 (1968).

An important contextual note is that since 1973, the legal emphasis has been the "least restrictive alternative," meaning an emphasis on encouraging patients to voluntarily seek out and actively participate in mental health treatment to achieve better treatment results. The anchor for this doctrine, *Matter of Kesselbrenner v. Anonymous,* 33 N.Y.2d 161, 165 (1973), declared unconstitutional a provision of the Mental Hygiene Law that permitted civil mental health patients to be committed to a facility operated by the Department of Corrections.

Now, in 2017, here we are fighting against the criminalization by New York of those who voluntarily seek mental health care and treatment and/or who present with a medical condition that appears to have mental health overtones, such as diabetes, hyperthermia, stroke, and encephalitis. It is referred to accurately as "criminalization" because the individual information transmits from the medical provider to OMH, from which it flips from civil into criminal at DCJS and to the NYS Police, as well as the FBI, and for law enforcement purposes. (Ex. 3.)  Unfortunately, right now, MHLS has no responsibilities in the license hearing setting, even if it had responsibility to the individual as a patient in the hospital setting.

The State of New York offers so many assigned counsel programs that it has an Office of Indigent Legal Services to oversee all such operations.  In addition to the criminal defense attorneys such as the Public Defenders Offices, there are many civil rights defense attorneys such as the Assigned Counsel Program, Assigned Appellate Counsel Program, Office of Attorneys for Children, and Legal Aid.  See: https://www.ils.ny.gov/content/resources-new-york-state.  The range of civil matters for which assigned counsel is available ranges from termination of parental rights (FCA Art. 10, see FCA §262), child support contempt (FCA Art. IV, see *id.*), Family Court civil orders of protection (FCA Art. VIII, see *id.*), counsel assigned from the private bar when there is a conflict of interest for a public agency attorney (see County Law Art. 18-B), and more. In "State of the Judiciary – 2012," New York Court of Appeals Chief Justice Lippman's reminder is clear: "…the Judiciary has a special responsibility and a constitutional mission to foster equal justice."  At: https://www.nycourts.gov/admin/stateofjudiciary/SOJ-2012.pdf.

Discrimination is real even in 2017 against those with mental illness or even those accused of having a mental infirmity.  The label of "involuntary commitment" is perhaps the worst mischaracterization that can be placed against a person's name.

> "[I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact upon the individual." *Addington, supra*, at 425-426.

The undersigned respectfully submits that without a court declaration of a right to counsel for individuals facing mental health accusations in the license setting, this group of defending litigants will not be able to find counsel.

### I.C.    THE COURT SHOULD DEFINE NOTIFICATION REQUIREMENTS THAT SATISFY THE RIGORS OF DUE PROCESS INTERSECTED WITH A FUNDAMENTAL CIVIL RIGHT.

The Plaintiff's circumstances are an illustration of the plight faced by every person reported under a mental health provision to the state and federal governments. There is no notification given at the point of depravation of rights, which is the point at which the individual is logged into the law enforcement database either at the state and/or federal level. There is no question of fact that the Defendant has not notified anyone of its actions to deprive individuals of their rights under the Second Amendment, with the exception of a few individuals who are handgun licensees against whom the NYS Police have taken an active role of secret notification letters to county-level licensing officers.

### I.C.(1.)    SIMPLE, EARLY NOTIFICATION OF INDIVIDUALS COULD SATISFY MINIMUM DUE PROCESS REQUIREMENTS UNDER *MATHEWS V. ELDRIDGE* WHEN ONE OR MORE FUNDAMENTAL RIGHTS ARE IMPLICATED.

The classic test of a Fifth (Fourteenth) Amendment Due Process Clause claim originates from *Mathews v. Eldridge*, as follows:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the

procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Supra.*, at 335.

The *Mathews* factors can be applied to the circumstances of the present secret reporting system with relative ease, leading to a conclusive outcome.

First, the private interest involved is fundamental: such rights as are afforded to the individual under the Second Amendment, whether or not such rights have been or ever will be exercised by the individual. *McDonald, id.; Heller, id.*

Second, the risk of erroneous depravation of such interest through the procedures used is extraordinarily high. The individual's rights are exterminated without notice, and the individual may or may or may not become aware of such depravation for a period of years until such time as he or she should ever attempt to purchase a firearm and be denied by the FFL due to a failed NICS background check. (Capanna, ¶20.) The Defendant operates in secrecy, moving the allegations from the medical provider through OMH to DCJS to NYS Police to the FBI/ATF and to county and local officials. (Ex. 3.) The notification for the few handgun license holders so notified comes in the form of an *ex parte, sua sponte* Order to Show Cause delivered by law enforcement officers carrying our concurrent confiscation of the license and the firearms, which firearms potentially constitute evidence in future criminal proceedings against the individual. (Compl. ¶¶10, 18, 20; Ex. 1; Ex. 2; Ex. 3.) The government does not file a complaint or accusatory instrument. (Compl. ¶4, ¶37, ¶38.) The Court functions as a prosecutor and judge. (Compl. ¶9, ¶36.) The licensee is forced to guess what allegations are being made. (Compl. ¶38, ¶41.) Judges are making errors in what statute is being applied to justify the depravation. (Capanna, ¶14; Ex. 7.) There is no alternative but to submit to the license hearing or the revocation of the license and the loss of the

firearms is a foregone conclusion. (Ex. 2.) The manner of the hearing itself involves a further

intrusion into the privacy of the licensee as medical records are a necessary component of the

defense. (Compl. ¶¶66-73.) And almost certainly the licensee is going to make statements at the

time of service or on the record in open court that could implicate him or her in a federal felony,

punishable by 10 years in jail and with monetary fine.

Third, counsel and the earliest possible notification would add significant value to the

protection of the individual's Second Amendment rights, as well as other valuable civil rights such

as those of the Fifth Amendment.  The earlier an individual is notified and can be assigned

counsel, the sooner the necessary records can be gathered and preserved, the individual can be

interviewed, witnesses can be brought together, and any errors can be proactively sought to be

corrected. (Capanna ¶19.)  In such a setting, the attorney can advise concerning the interim

transfer of firearms, whether to a family member or friend who is also a licensee or to a FFL

dealer.  This earlier notification would also occur in closer proximity to any actual mental health

event, thus increasing the public safety argument for persons who may only have long guns and

thus not be in possession of a registered firearm.  It will also reduce the burden on the FBI/ATF by

those persons who would otherwise begin their corrective efforts through the ATF Voluntary

Appeals Process because the first notification occurred at the point of denial while at the FFL as a

potential customer.  The benefits to the state and federal government of such an approach are

many; there is no downside. (Capanna ¶18.)

### I.C.(2.)  PARTICULARLY IF NOTICE IS BEING GIVEN POST-DEPRAVATION, THE EARLIER THE BETTER FROM A DUE PROCESS STANDARD.

When we analyze due process claims for notification, it is also important to analyze the

pre-deprivation versus post-deprivation sequencing and possibilities.  This case does not reach the

level of a request for a pre-depravation notification, but leaves it instead for a future case. The most efficient notification request that could be immediately implemented for the price of a postage stamp is what is being requested herein. Admittedly, it is a post-depravation notification because it would occur at the point that the DCJS has taken the individual's identity from a medical provider through the OMH and logged it into the criminal justice system and potentially the FBI NICS system.[5]  (Ex. 3.)

Notification of the intentional depravation of a fundamental civil right cannot be left to the whims of government, nor the chance finding of the individual. Notification to the individual must be systematic and designed to successfully notify the individual not only of the rights being infringed through government action, but, also, of the available remedy that may be had to restore the rights. Notification of every individual inserted secretly into state and federal databases by the Defendant must be ordered to be made at the earliest opportunity in that process, or, no later than the point at which DCJS accepts a record of an individual arising from medical care and treatment into a database that they manage and from which additional government notifications are made or shared.

## II.    OPPOSITION TO THE MOTION TO DISMISS

The Plaintiff's claims are, first, a simple request under 18 U.S.C. §925A for the correction of government records infringing her fundamental rights under the Second Amendment, and, two requests in the interests of due process that the right to counsel be afforded to individuals similarly

---

[5] A superior notification standard would place the responsibility for notification into the involuntary commitment proceeding, as it is already infused into the Family Offense Proceeding. Such possibilities are left for a future case or legislative effort, and it is requested that the decision of this Court does not foreclose the possibility of bringing the notification requirement to this higher standard.

situated and that notification be granted at an earlier stage and to all individuals otherwise secretly processed by the government. The first claim is a simple application of the law as it stands to give full relief from a valid and binding lower court decision. The second and third claims involve constitutional concepts, guided by due process, and where "we must be mindful that the function of legal process is to minimize the risk of erroneous decisions." *Mathews, supra,* at 335.

### II.A.   THE COMPLAINT MEETS THE "PLAUSIBILITY ON ITS FACE" STANDARD.

A court deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) "…must accept all allegations in the complaint as true and draw all inferences in favor of the non-moving party." *Joseph S. v. Hogan*, 561 F.Supp. 280, 288 (E.D.N.Y. 2008). All allegations of the Complaint must be read to be true and all reasonable inferences must be drawn in favor of the Plaintiff. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Fed.R.Civ.P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), overruling *Conley v. Gibson*, 355 U.S. 41 (1957). Wright & Miller phrases in the positive that Fed.R.Civ.P. 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented." *Twombly, id.*, 555, ftnt. 3.

"Each allegation must be simple, concise, and direct. No technical form is required." Fed.R.Civ.P. 8(d)(1). The pleading needs "only enough facts to state a claim to relief that is

plausible on its face" *Twombly, id.* at 570.  "The plausibility standard is not akin to a "probability

requirement…" *Ashcroft, supra*, 678, citing *Twombly.*

"Pleadings must be construed so as to do justice." Fed.R.Civ.P. 8(e).

The Complaint sets out tangible and detailed allegations on how the Defendants.

The "assumption" of truth to be afforded to the Plaintiffs under Fed.R.Civ.P. 12(b)(6) is

supported by the available evidence.  "The Court may take judicial notice of and rely on

information not included in the pleadings, but which can be found via government websites,

reports, etc." *Ohio Valley Envt'l. Coalition, Inc. v. Fola Coal Co., LLC,* 2013 U.S. Dist. LEXIS

154195 (WVSD, 2013).

The Complaint in this case is written with a very high degree of specifity and depth.  It

provides a detailed narrative of the circumstances that befell the Plaintiff because the Defendant

erroneously accused her of having been "involuntarily committed" – a false accusation of a federal

felony that it made without having conducted any investigation in to whether a court case had been

filed and a court order signed against her for such involuntary commitment to a mental institution.

(Compl. ¶¶1-42.)  The Complaint further describes and establishes the secret reporting system

used by the Defendant for reporting some 80,000 people per year under two classifications,

through which it fails to distinguish and accurately report to the federal government only those

persons who have been involuntarily committed pursuant to a court order in accordance with the

federal definition of "involuntary commitment." (Compl. ¶¶43-104.)  The Complaint also lays out

the significant risks of erroneous depravation of fundamental rights without even notification by

the Defendant, nor the availability of assigned counsel.  (Compl. ¶¶43-104.)

**II.B.**   **THE COMPLAINT PLEADS A *PRIMA FACIE* CLAIM FOR THE RIGHT TO COUNSEL AS PART OF THE RIGHT OF DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.**

The *Mathews* three-part test (detailed and discussed, above) is the basic criteria for the evaluation of a depravation of due process, whether we are talking about a right to counsel or notification. The Complaint sets out the requisite elements for a court determination of a right to counsel as a matter of first impression, as follows:

(a.)   existence of a fundamental civil right (Complaint, ¶¶9-10; ¶51, ¶52, ¶53, ¶92);

(b.)   the potential for the permanent loss of the right on a nationwide basis (Complaint, ¶¶13-14, ¶92 ¶¶93-97 ¶100);

(c.)   the complexity of the proceeding to preserve one's fundamental civil rights (Complaint, ¶31, ¶34, ¶¶35-41, ¶¶43-49, ¶¶54-58, ¶60-61, ¶63, ¶¶66-73, ¶¶74-79, ¶88, ¶89, ¶95-96, ¶101);

(d.)   the high risk of erroneous depravation of one's fundamental civil rights (Complaint, ¶¶5-9, ¶11, ¶12, ¶15, ¶42, ¶50, ¶65, ¶74, ¶75, ¶77, ¶85, ¶86, ¶87, ¶88, ¶89, ¶90, ¶93, ¶94, ¶97, ¶98, ¶¶102-104);

(e.)   the criminal accusation being made against the licensee and the potential criminal repercussions of a negative finding (Complaint, ¶¶1-4, ¶13, ¶14, ¶62); and,

(f.)   the lack of meaningful alternative remedies (Complaint, ¶¶32-33, ¶92, ¶99, ¶¶102-104).

The license proceedings commence with a criminal allegation made by the NYS Police to the County Court, which takes action *ex parte, sua sponte,* and without any underlying accusatory

instrument or petition.  The proceeding collapses the role of judge and prosecutor into one.  There is a reason that the right to counsel and procedural due process has already been recognized. *Powell v. Alabama,* 287 U.S. 45 (1932).  As described in *Gideon,*

> "Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.  He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one." *Supra,* at 345.

The type of license hearing suffered by the Plaintiff readily blurs the lines between civil and criminal due process requirements and creates a courtroom situation not unlike the deep south of *Gideon* in the decades before the U.S. Supreme Court recognized a universal right to counsel for defendants in specified criminal settings.

Counsel for the Defendant misquotes *In re Martin-Trigona,* 737 F.2d 1254, 1260 (2nd Cir. 1984), *rev. U.S. v. Martin Trigona,* 756 F.2d 260 (1985), *sub. app. hist..*  The complete quote that Mr. Levine truncated in his Memorandum should have read:

> "The sixth amendment right to counsel of course extends only to criminal and quasi-criminal proceedings. (citations omitted)  In non-criminal cases federal courts have the authority to appoint counsel, but generally they are not required to do so. (citations omitted).  The determination of whether appointment of counsel is necessary rests with the discretion of the court. (citations omitted)."

At issue was the request of the litigant for assignment of counsel on a contempt motion requesting an injunction against his filing of future proceedings.  The District Court injunction was reversed and further proceedings ensued.  It should be distinguished from the pending case.

The request for a right to counsel in a license hearing involving fundamental civil rights under the Second Amendment is a watershed issue for judicial determination. It should be distinguished from the other case cited by Counsel to the Defendant, *Fann v. Arnold,* 2016 U.S. Dist. LEXIS 64039 (W.D.N.Y., May 16, 2016), wherein the Plaintiff requested appointment of counsel pursuant to 28 U.S.C.S. §1915(e).

First, a license hearing takes place in state court, not federal court, such that the application for appointment of counsel under 28 U.S.C.S. §1915(e) would not be available.

Second, there is no precedent in state court to suggest an appointment of counsel under CPLR §1102 would meet either standards of judicial economy or standards of quality of the counsel assigned. Given that nearly 4% of the population of the State has been put into the secret law enforcement databases since January 2013, or, nearly 600,000 individuals, assignment on a case-by-case basis will be impracticable once notification of all such individuals is granted. Further, without any notification requirement for a judge to inform licensees of the availability to apply *in forma pauperis* for the appointment of counsel, it is incredible to believe that there will be an appropriate level of application plus application granted.

That would still leave the question of the competency of counsel. "Whatever disagreement there may be as to the scope of the phrase 'due process,' there can be no doubt that it embraces the fundamental conception of a fair trial." *Frank v. Mangum,* 237 U.S. 309, 347 (1915) (Holmes, J., dissenting). Just as an individual attorney representing clients in termination of parental rights cases must demonstrate minimum competency for such work, along with bi-annual continuing legal education seminars on the specified topic, no lesser standards should be accepted for

assignments to defend against the wrongful depravation of fundamental rights under the Second Amendment involving mental health accusations.

The Plaintiff's license hearing was taken over mid-trial by the undersigned and we did prevail. The Plaintiff's first attorney had no experience in license hearings and knew little about the "SAFE Act." (Complaint, ¶33.) The attorney was selected because he was the only attorney willing to make himself available for a deposit of $450. (Complaint, ¶32.) The first attorney started the case focusing on MHL §9.46, concerning which the Plaintiff was not accused. (Capanna, ¶14.) Although the text of the County Court decision and order correctly set out the facts and applied a nearly correct legal analysis, even the County Court Judge made one typographical error using a MHL §9.46 reference instead of the 18 U.S.C. §922(g)(4) citation. (Capanna, ¶14).

If the Second Amendment is truly to mature into its position as one of our fundamental civil rights, a fully-integrated Bill of Rights must be afforded to it. It is time for the Second Amendment as a fundamental right to meet the Fifth, Sixth, and Fourteenth Amendment guarantees of due process, including a right to counsel to assure that which is "fundamental and essential to a fair trial" is made obligatory upon the States. *Gideon, supra,* 341.

### II.C.   THE COMPLAINT PLEADS A *PRIMA FACIE* CLAIM FOR NOTIFICATION AS PART OF THE RIGHT OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

Adding to the above analysis of the Complaint using the *Mathews* three-part test relative to a right to counsel, the claim for early post-depravation notification to all persons impacted by the Defendant's secret reporting system is similarly presented in satisfactory form. On so many levels, these two claims are intertwined and are the bare minimum that an individual like the

Plaintiff would require in order to have any shot at a fair defense of false accusations of "involuntary commitment" or other, similar mental health allegation.

Whether or not the Plaintiff was "notified" and had an opportunity to respond to that notification does not divest this Court of review of what happened to her and to issuing an opinion on point. The Court can address the situation now, with an awareness of the numbers of individuals involved, or it can do so on the next case or the one after that or the one after that. *McKay* is a case of first impression and it is a test case for others ready to file similar cases. While Counsel for the Defendant may prefer this approach due to the law of averages, these issues more resemble large scale litigation such as that found against big tobacco and asbestos manufacturers. The Defendant is legally incorrect in its processing of every mental health patient at hospitals as having been "involuntarily committed" and in failing to provide any notice to allow as a cross-check to the erroneous depravation of fundamental civil rights.

The paragraph-by-paragraph analysis of the Complaint is offered also to support the *prima facie* claim of inadequate notification under due process (above).

## III.   THE PLAINTIFF'S CASE IS NOT BARRED BY THE ELEVENTH AMENDMENT TO THE U.S. CONSTITUTION.

Counsel to the Defense inserts an argument into the Memorandum that the Plaintiff's claims are barred by the Eleventh Amendment. (Def. Memo., pp. 3-4.) First, any such claim cannot be made in a motion to dismiss the case for failure to plead causes of action pursuant to Fed.R.Civ.P. 12(b)(6). The Defendant waived any defense concerning jurisdiction by filing its motion solely on Fed.R.Civ.P. 12(b)(6) grounds. Fed.R.Civ.P. 12(h). Second, the Plaintiff prevailed in the county court proceeding and is not seeking a review of it by this federal court.

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-292 (2005).  Indeed, the Plaintiff expects that this federal court will afford full faith and credit to the determination of Judge Falvey adjudicating that the Plaintiff is not a disqualified person because she was not "involuntarily committed." 28 U.S.C. §1738.

Whether compensatory damages can be awarded against the Defendant as a State is also not part of a motion under Fed.R.Civ.P. 12(b)(6).  Monetary damages would be ancillary relief. The current issues are whether the Court will deny the Defendant's motion under Fed.R.Civ.P. 12(b)(6) and whether the Court will grant the Plaintiff's cross-motion for summary judgment.  If these two events occur, the Plaintiff asks leave to then make such further submissions with respect to any monetary damages that may be claimed by and awarded to the Plaintiff.

As to the State's argument that 18 U.S.C. §925A is unconstitutional, the same should be fashioned as part of a cross-claim.  It is improperly inserted into the State's motion to dismiss under Fed.R.Civ.P. 12(b)(6).

The Plaintiff would otherwise only ask to preserve the opportunity to correct any defects in the pleading of its Complaint if the Court finds otherwise, allowing 30 days to complete and serve such an amended or supplemental pleading.  Fed.R.Civ.P. 15(a)(2); Fed.R.Civ.P. 15(d).

IN CONCLUSION, we look to this Court in earnest for the protection of our rights.

Dated:  May _12_, 2017

Paloma A. Capanna, Attorney